SMYTHE v. SUPREME LODGE, K. P.

(District Court, N. D. New York. September 23, 1912.)

1. INSURANCE (§ 693*)—CORPORATE ACTS—EVIDENCE.

The testimony of the secretary of an insurance order that he has the custody of its minutes and records, and that a pamphlet introduced in evidence contains a true copy of a new constitution and general laws of the order relating to insurance which were adopted and promulgated by the Supreme Lodge on a certain date, does not establish either their adoption or promulgation, where the witness does not claim to have any personal knowledge of the facts, the records are not introduced in evidence, and there is no testimony that the matter contained in the pamphlet is a copy of anything therein.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1833; Dec. Dig. § 693.*]

2. INSURANCE (§ 719*)—MUTUAL BENEFIT INSURANCE—INCREASE OF ASSESSMENTS—ASSENT OF MEMBER.

Where, at the time of the making of a contract of insurance between a fraternal order and a member, the constitution of the order contained a table of the monthly assessments required to be paid by each member insured, graded according to age at the time of the contract, a copy of which was furnished to the member, together with a printed statement

signed by the board of control, representing that the assessments remained the same through life, an agreement by the member in his application that, "I will punctually pay all dues and assessments for which I may become liable and that I will be governed, and this contract shall be controlled, by all the laws, rules and regulations of the order governing this rank now in force or that may hereafter be enacted by the Supreme Lodge," does not amount to a consent that the Supreme Lodge may by a subsequent enactment so amend the constitution and fundamental law of the order as to largely increase his assessments, and, in the absence of an explicit consent thereto, the member cannot be bound by such action, which impairs vested rights secured to him by the contract.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1855; Dec. Dig. § 719.*]

3. INSURANCE (§ 719*)—MUTUAL BENEFIT INSURANCE—POWER TO INCREASE RATES—GENERAL PROVISION AUTHORIZING AMENDMENT OF LAWS.

A general provision in the constitution of a fraternal order which insures the lives of its members that the constitution and general laws may be amended by a specified vote of the Supreme Lodge cannot be so construed as to authorize amendments which materially increase the premiums or assessments to be paid by members under existing contracts, where no power to increase such rates is specifically reserved in the contracts.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1855; Dec. Dig. § 719.*]

4. INSURANCE (§ 719*)—MUTUAL BENEFIT INSURANCE—CONTRACT.

Where a member of a fraternal insurance order on making his application and contract of insurance was furnished by the officers of the order with copies of its constitution and by-laws relating to insurance, upon which he relied, he cannot be held bound by the provisions of a later constitution and by-laws, which, although adopted prior to his contract, were not disclosed to him, and which materially affect his contract rights.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §. 1855; Dec. Dig. § 719.*

Mutual benefit insurance contracts as affected by subsequent provisions and amendments of charter, constitution, or by-laws, see note to Supreme Council A. L. H. v. Champe, 63 C. C. A. 285.]

In Equity. Suit by Arthur V. H. Smythe against the Supreme Lodge, Knights of Pythias. On final hearing. Decree for complainants.

This is an action in equity to enjoin and restrain the defendant from canceling, or attempting to cancel, a policy of insurance issued by it and delivered to the plaintiff, and on which plaintiff has paid assessments for many years, but on which the defendant now demands the payment of increased assessments. The plaintiff also asks judgment that, in case the defendant shall have canceled said policy prior to the judgment or decree of the court in the premises, it be adjudged to restore same and continue same in force at the same rates of assessment and monthly payments as specified in the policy and fixed at the time the policy was issued.

R. J. Sanson and H. V. Borst, both of Amsterdam, N. Y., for plaintiff.

John J. McCall and W. E. Ward, both of Albany, N. Y. (J. Goodrich, of Indianapolis, Ind., of counsel), for defendant.

RAY, District Judge (after stating the facts as above). The true and correct name of the defendant is Supreme Lodge, Knights

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of Pythias, and the pleadings, etc., by stipulation in open court on the trial were amended accordingly. The case was removed from the Supreme Court of the state of New York into the United States court. The plaintiff is a resident and citizen of the county of Montgomery, state of New York, and the defendant is a corporation organized and existing under an act of Congress making it a corporation of the District of Columbia, and was and is engaged in the business of insurance of its members of and through the endowment rank of said corporation. On the 7th day of November, 1889, the plaintiff was, and for some time prior thereto had been, a member of such corporation in good standing, and he has continued such ever since, and now is a member thereof in good standing.

The said corporation had a constitution and by-laws providing for and relating to the establishment of "an endowment rank"; the constitution in section 4 of article 1 defining the powers of the Supreme Lodge providing:

"To grant warrants to members of the order of Knights of Pythias, duly qualified, upon proper application, for establishment of sections of the Endowment Rank, and to enact laws and regulations, of general application, to establish and govern. the same."

Section 6 of the said article also provides:

"To create, hold and disburse the funds of the Endowment Rank, under such regulations as it may deem necessary."

Section 8 of the same article says:

"To issue certificates and provide for the payment of same under the laws, rules and regulations embodied in the constitution in the sum of one thousand dollars ($1,000), two thousand dollars ($2,000), or three thousand dollars ($3,000), as may be applied for under the laws of the Endowment Rank."

Article 2 provides for the formation of sections, and article 3 relates to membership therein and qualifications for such membership. Article 4 of the constitution reads as follows:

"Article IV. Monthly Assessments and Forfeiture of Certificates of Endowment. Section 1. Each member of the Endowment Rank shall, on presenting himself for obligation, pay to the secretary of the section, in accordance with his age and the amount of endowment applied for, a monthly assessment, as provided in the following table, and shall continue to pay the same amount each month thereafter as long as he remains a member of the Endowment Rank."

Then follows a "table of monthly assessments," giving age of the member and the sum to be paid monthly under each class of certificates.

Article 11, relating to "Amendments," reads as follows:

"Art. XI. Amendments. These laws may be altered or amended at any regular session of the Supreme Lodge, Knights of Pythias of the World, by a two-thirds vote."

There are "general laws for the government of sections of the Endowment Rank," which provide, among other things, for officers and specify their duties, and article 12 thereof provides for "amendments" thereto as follows:

"The provisions of these general laws may be altered or amended at any regular session of the Supreme Lodge Knights of Pythias of the World by a two-thirds vote."

· I have quoted from and referred to "constitution and general laws of the Endowment Rank Knights of Pythias of the World, adopted at the fourteenth session of the Supreme Lodge held at Toronto, Ont., July 13, to 23, inclusive, 1886," as these were the ones given to the plaintiff herein at about the time of his application and the issue to him of his certificate.

Under and pursuant to said constitution and laws, a section (No. 279) was duly established at Amsterdam, N. Y., and the complainant, Arthur V. H. Smythe, duly applied for membership and an endowment certificate or policy of $3,000 by a written application dated October 26, 1889. He was born December 27, 1852, and his age at nearest birthday was then 37 years. The application blank filled out and signed by him and filed with and accepted by the defendant showed on its face in "table monthly assessments" that the monthly assessment would be $3. On the 7th day of November, 1889, "certificate of membership, fourth class, No. 23,868" was executed by J. A. Huisey, president of board of control, and W. B. Kennedy, supreme secretary of the Endowment Rank, and November 26, 1889, the same was delivered to the complainant, Arthur V. H. Smythe, who signed the following agreement indorsed thereon, viz. :

"I accept this certificate of membership subject to all the conditions therein contained.                                     Arthur V. H. Smythe.

"Dated at Amsterdam, this 26th day of November, 1889."

· Same was duly attested by the signature of Jacob L. Fredendall, secretary of section 279 E. R. The said certificate of membership so issued and delivered to the complainant reads as follows:

"No. 23,868. Certificate of Membership. Fourth Class. $3,000.

"Endowment Rank of the Order of Knights of Pythias.

·"This certifies, that brother A. V. H. Smythe received the obligation of the Endowment Rank of the Order of Knights of Pythias in section No. 279 on Nov. 2, 1889, and is a member in good standing in said Rank, and in consideration of the representations and declarations made in his application bearing date of Oct. 26, 1889, which application is made a part of this contract, and the payment of the prescribed admission fee; and in consideration of the payment hereafter to said Endowment Rank of all assessments as required, and the full compliance with all the laws governing this Rank now in force, or that may hereafter be enacted and shall be in good standing under said laws, the sum of three thousand dollars will be paid by the Supreme Lodge Knights of Pythias of the World, to his children as directed by said brother in his application, or to such other person or persons as he may subsequently direct, by change of beneficiary entered upon the records of the Supreme Secretary of the Endowment Rank, upon due notice and proof of death, and good standing in the rank at the time of death, and surrender of this certificate.

"Provided, however, that the interest of any beneficiary as designated by said brother, or the interest of his or her heirs, shall cease and determine in case of the death of said beneficiary during the lifetime of such member, and ·in that case the benefit accruing under this certificate shall be paid as provided for in article XII, section I, of the Endowment Rank constitution.

"Provided, that if at the time of the death of said brother the proceeds of one assessment on all members of the Endowment Rank, shall not be sufficient to pay in full the maximum amount of endowment held under this certificate, then there shall be paid an amount, less ten per cent for expenses, equal to the proceeds of one full assessment on all remaining members of the Endowment Rank, and the payment of such sum to the beneficiary or beneficiaries, mentioned herein, shall be in full of all claims and demands under and by virtue of this certificate. And it is understood and agreed that any violation of the within mentioned conditions, or the requirements of the laws in force governing this Rank, shall render this certificate and all claims null and void, and that the said Supreme Lodge shall not be liable for the above sum or any part thereof.

"In witness whereof, we have hereunto subscribed our names and affixed the seal of the Supreme Lodge Knights of Pythias of the World.

"Issued this 7th day of Nov., 1889, P. P. XXVI at Chicago, Illinois, and registered in Book 2 Folio 178.

"[Seal.]          J. A. Huisey, President Board of Control.

"Attest: W. B. Kennedy, Supreme Secretary of the Endowment Rank.

"I hereby accept this certificate of membership subject to all the conditions therein contained.

"[Signature of Member] Arthur V. H. Smythe.

"Dated at Amsterdam, this 26th day of November, 1889.

"Attest: Jacob L. Fredendall, Secretary Section No. 279, E. R.

At or about the time of his application, and in any event with his certificate or policy, there was delivered to the complainant a printed representation or statement signed, "Board of Control, Endowment Rank, Knights of Pythias," which contained the following:

"The Endowment Rank
is under supervision and direction of a
Board of Control
elected by the
Supreme Lodge, Knights of Pythias of the World.

"It is the only beneficial insurance department of the Knights of Pythias.

"Applicants may obtain an endowment of $1,000., $2,000., $3,000., $4,000., or $5,000.

"Beneficiaries may be either persons related to or dependent upon the member for support. A change of beneficiary, in accordance with law, may be made at any time and as often as desired.

"A member is the absolute owner of his certificate of endowment, and controls its disposition as stated above.

"Endowments are exempt from payment of debts of the member, being paid direct to the beneficiary, whose interests are protected by law.

"The system of the Endowment Rank is based upon actual cost of insurance during expectancy of life, divided, for convenience, into fixed monthly payments during the life of the applicant in accordance with his age at date of applying for membership. These payments do not increase with increasing age, but always remain the same during good standing of the member.

"To qualify, an applicant for admission to the Endowment Rank, he must not be over fifty (50) years of age, a member in good standing of a subordinate lodge Knights of Pythias, and pass a satisfactory medical examination, which must be approved and accepted by the board of control."

This also contained a "Table of Monthly Payments" showing $3 to be the monthly payment of a member 37 years of age at the time of application and admission.

The complainant continued to pay, not only his lodge dues, but his monthly assessment of $3, and also extra assessments down to

1901, or 1902, when he received a pamphlet (Exhibit E), which informed him that thereafter his monthly assessment would be $4.80, and this he paid thereafter down to January 1, 1911, when he received from the insurance department of the defendant (formerly board of control) a notice which contained the following:

"Name, A. V. H. Smythe. Certificate No. 23,868. Section No. 279. Amount of certificate, $3,000. Amount of present monthly payment, $4.80. Born, 12–27, 1852. Age at nearest birthday, January 1, 1911, 58 years.

"Indianapolis, Ind. 12–13, 1910.

"Dear Sir and Brother:

"The Supreme Lodge, Knights of Pythias, in regular convention assembled, on the 10th day of August, A. D. 1910, by section 468, Supreme Statutes, relating to the insurance department, enacted and provided that:

"(1) (Paragraphs B and C.) Every member of the fourth class on January 1, A. D. 1911, shall be rerated according to his attained age and occupation and amount of benefit provided for in his certificate, in accordance with the table of rates therein provided and his monthly rates thereafter to be as provided for by said table, unless the member shall elect to take some one of the options provided for in said section 468. If you do not elect to take one of the options and desire to continue the amount of your present certificate for the remainder of your life, then, beginning with the month of January, 1911, and for each month thereafter, your monthly payment will be $14.70. If you accept one of the following options, the above paragraph will not apply to you.

"The options are as follows:

"(2) (Paragraph D.) You may surrender your present certificate and accept a certificate in lieu thereof and for the amount thereof, which will insure you for the term of five (5) years for the monthly payment of $7.95, or for the term of ten (10) years for the same amount for the monthly payment of $9.30. At the end of the five (5) or ten (10) years period, whichever you elect to accept, the certificate will terminate and you will no longer be insured under it. If you should die while the certificate is in force and before its determination, the amount thereof will be paid your beneficiary.

"(3) (Paragraph E.) Or you may elect to continue making the same payment which you now pay each month, to wit, $———, from and after January 1, 1911, and upon surrendering your present certificate, a new one will be issued to you for the amount of the old certificate, but it will terminate on the ——— day of ———, A. D., 19——; your present rate being sufficient to give you life insurance protection until said date, but no longer. If you die within that time, the amount of the certificate, if in force, will be paid to your beneficiary, but it will expire on that date, and you will no longer be insured under it.

"(4) (Paragraph F.) Or if you so elect, you may have your present certificate scaled down to such a sum as the rates that you are now paying will provide insurance for the whole period of your life, regardless of when your death occurs, and your rate under this plan will be just what it is now, that is, $4.80 per each month, but the amount of your certificate will be $978.00 instead of its present amount, and if kept in force until your death, regardless of when death occurs, the amount thereof will be paid your beneficiary.

"(5) (Paragraph G.) Or if you elect to retain the present certificate that you have and are unwilling to accept any of the other options, you may have a lien placed against your certificate, the amount of such lien to be deducted at the maturity of the certificate, whenever the same matures by your death, and you may continue to pay the same rate that you are now paying, to wit: $4.80 per each month. Under this option the lien will be $2,022.00 and will be deducted from the face of your certificate at maturity, leaving the balance of $978.00 to be paid to your beneficiary.

"(6) (Paragraph H.) Or you may elect to continue the full amount of your insurance protection for the whole period of your life and to be rerated as of your age at nearest birthday January 1, 1911, and if you are unable to make the payment of $14.70 that will be due from you under said certificate

as each monthly payment from and after January 1, 1911, and will satisfy the board that you are unable to pay the whole of said monthly payment in cash, then you may pay in cash the sum of $7.95 for each month and the sum of $6.75 for each month will be charged against your certificate, together with 5 per centum per annum as interest, which said sums not so paid by you with the interest, whatever they aggregate at the time of the maturity of your certificate, will be deducted from the face amount thereof. You may, if you choose, relieve your certificate of this lien, or any portion thereof, at any time, by paying the amount of same or any portion thereof.

"(7) Or you may, if you choose, transfer the whole or any portion of your insurance from the fourth to the fifth class, such transfer to be made without expense to you and without medical examination, but in the event of such transfer you will be rerated at your attained age and in accordance with the plan in said fifth class to which you elect to transfer.

"You are required by said enactments of the Supreme Lodge to elect in writing on or before the first day of January, 1911, which of the options you will avail yourself of, and in the event you fail to make such election, your rates on January 1, 1911, will be automatically raised, as is stated in the first paragraph hereof, to the sum of $14.70, which sum will be due from you for each month thereafter, beginning with the month of January, 1911.

"If you desire any further information with respect to any of these options, it will be cheerfully furnished you.

"The sole purpose of the Supreme Lodge in taking the action noted above was to provide sufficient funds so that every and the last certificate may be paid at maturity and that each member may bear his just and equitable portion of the cost of raising the requisite funds for such purposes.

"From and after January 1, 1911, every certificate in the fourth class will be annually valued the same as certificates in the fifth class, and the surplus that may be accumulated will be distributed in the same way as it is done in the fifth class, by the waiving of assessments, and all fourth class certificates, after they have been in force for three years after January 1, 1911, will be incontestable for suicide, the same as are the certificates in the fifth class.

"Please sign one of the elections herewith enclosed, all blanks of which have been filled out, and return it to the Board of Control at once. Do not sign more than one election."

"Fraternally submitted,
"Board of Control,
"By Union B. Hunt,
"President Insurance Department."

This was accompanied by blank forms of acceptance of "options" tendered. The complainant did not accept either of said options, but each month thereafter duly tendered to the secretary and treasurer of his lodge, the officer authorized to receive assessments, the sum of $4.80, which such secretary and treasurer refused to accept, informing the complainant that he was instructed by the Supreme Lodge not to accept. Inasmuch as by the constitution and by-laws a certificate or policy will end and become of no force and effect unless the legal assessments are paid, this action was brought December 31, 1910, in effect, to compel the defendant to accept the monthly assessment of $4.80 and continue this certificate or so-called policy in force.

The case turns, as I view it, on the power of the Supreme Lodge under its constitution to increase this monthly payment or assessment from $4.80 per month to the sum of $14.70 per month, and, in default of payment thereof, treat and consider the said certificate as of no force or effect. The defendant, under the plaintiff's objections, has been allowed to give evidence tending to show that this increase of

monthly assessment on the older members, those who have held policies for a long time paying the assessments fixed at the time they became members of the endowment class, is necessary in order to provide a fund sufficient to pay the full amount of the policies or certificates issued prior to and since that time. It may be remarked here that the increased assessment after 1901 was to create a "surplus fund," and its payment in no way amounts to a concession by the complainant that the defendant had any legal right to increase his monthly payment or assessment, and, in case of refusal to pay the increased assessment, cancel the policy or treat it as of no effect.

The application for the certificate and membership in the endowment class contains the following:

"Read carefully the following declaration and agreement and observe its import:

"I declare that I am not now a member of the Endowment Rank, Knights of Pythias, and have not been rejected as an applicant thereof. I declare, furthermore, that all of the above statements are true to the best of my knowledge and belief, and that I have not concealed or omitted to state anything regarding my health, past or present, affecting the expectancy of my life; and that I hereby consent and agree that any untrue statement made in this application, or to the medical examiner, or any concealment of facts touching my health, or expectancy of life, or for failure or neglect to pay any or all assessments and dues as prescribed by the laws of the Rank or Order, or for other causes, or voluntarily severing my connection with the Order, shall work a forfeiture to all my rights, and the rights of my heirs and beneficiaries to all benefits and privileges accruing to members of this Rank.

"I hereby agree that I will punctually pay all dues and assessments for which I may become liable, and that I will be governed, and this contract shall be controlled by all the laws, rules and regulations of the Order governing this Rank, now in force, or that may hereafter be enacted by the Supreme Lodge, Knights of Pythias of the World, or submit to the penalties therein contained. To all of which I willingly and freely subscribe.

"Dated at Amsterdam, N. Y., this, the 26th day of Oct., 1889.

"[Signature of Applicant] Arthur V. H. Smythe."

[1] The defendant contends that the constitution and general laws delivered to the complainant as above stated were promulgated August 20, 1886, and were not the ones then in force, but that same were thereafter and at a meeting of the Supreme Lodge held at Cincinnati, Ohio, June 12 to 23, 1888, inclusive, repealed, and that a new set of constitution and by-laws were then adopted and promulgated effective August 1, 1888. The defendant claims to have established this by the deposition of Mr. Walter O. Powers, General Secretary of the insurance department of the Supreme Lodge, Knights of Pythias, who testified in his deposition taken May 10, 1912, as follows:

"Question. You may state your name, age, and place of residence. Answer: (a) Walter O. Powers. (b) Age 37. (c) Indianapolis, Ind.

"Question. What is your occupation? Answer: I am the General Secretary of the insurance department of the Supreme Lodge, Knights of Pythias.

"Question. How long have you occupied that position? Answer: Since November 15, 1910.

"Question. Previous to that time, if you were connected in any capacity with the insurance department, Supreme Lodge, Knights of Pythias, state in what capacity and for how long. Answer: For eight years previous to my selection as Secretary of the insurance department I was in charge of the certificate department of the insurance department.

"Question. State what are your duties as General Secretary. Answer: My

duties as General Secretary are to keep and have charge of all of the books and records of the board, to receive all funds and deposit the same daily in the proper depository and liquidate the accounts of the insurance department; to conduct the general correspondence with Section Secretaries and members, and prepare and present to the executive committee all claims against the insurance department.

"Question. Are you acquainted and familiar with the books and records of the insurance department? Answer: I am, not only by reason of my employment in the office since 1903, but also by reason of the fact that I have since my election as Secretary made a careful and exhaustive examination of the records and books of the insurance department.

"Question. State what records, if any, of the Supreme Lodge you have in your custody as General Secretary. Answer: I have in my office and under my care and custody the official records and minutes of the Supreme Lodge, Knights of Pythias, so far as the same pertains to the insurance department and of all the Biennial Reports and accounts made by the insurance department to the Supreme Lodge since the year 1878. * * *

"Question. Have you examined a copy of the plaintiff's Exhibit C, purported to be the constitution and general laws of the Endowment Rank, Knights of Pythias? Answer: I have.

"Question. When, if you know, was the constitution and general laws set out in that pamphlet promulgated. Answer: On August 20, 1886.

"Question. Were these laws at any time thereafter repealed? Answer: They were.

"Question. When? Answer: At the session of the Supreme Lodge held at Cincinnati, Ohio, June 12 to 23, inclusive, 1888, at which session a new set of constitution and by-laws was promulgated, effective August 1, 1888.

"Question. Have you in your possession, Mr. Powers, the original minutes, records, and journal of the Supreme Lodge, Knights of Pythias, showing the adoption and enactment of the constitution and by-laws governing the insurance department at the June session, 1888, of the Supreme Lodge, Knights of Pythias? Answer: I have. (Counsel for defendant now hands to the notary a pamphlet, and asks notary to mark the same 'Defendant's Exhibit A.' The notary marks the pamphlet 'Defendant's Exhibit A.')

"Question. I hand you, Mr. Powers, the pamphlet marked 'Defendant's Exhibit A,' and ask you to state if you know what it is and what it contains? Answer: This pamphlet marked 'Defendant's Exhibit A,' contains a true and correct copy of the constitution and by-laws adopted by the Supreme Lodge, Knights of Pythias at the June session, 1888, which constitution and by-laws were promulgated and became effective August 1, 1888. The pamphlet contains all of the constitution and all of the by-laws in force and effective from and after August 1, 1888.

"Question. By what vote was this constitution and by-laws adopted? Answer: By a unanimous vote—107 ayes, no nays.

"Question. What was the total vote of the Supreme Lodge at its session in 1888? Answer: There were 107 representatives present and authorized to sit at this convention, each being entitled to one vote."

It is contended on the one hand and denied on the other that this establishes the adoption and promulgation of a new constitution and general laws prior to the date the complainant made his application and received his certificate. It is quite certain that, if adopted, they were not promulgated to the section to which the complainant belonged or to him. But complainant contends that this evidence of Powers, if admitted, does not establish either the adoption or promulgation of this alleged "new set" of constitution and general laws.

Section 1 of article 4 of the alleged new constitution and laws, relating to "monthly assessments and forfeiture of certificate of endowment," reads the same as section 1 of article 4 of the con-

stitution and laws given to the complainant and above quoted, except that in the new constitution there is added the words "unless otherwise provided for by the Supreme Lodge, Knights of Pythias of the World." In the constitution and laws given to the complainant there is no clause or provision authorizing the board of control to re-rate the tables of the fourth class, but the alleged new constitution and laws in article 8 has the following:

"Sec. 17. The board are hereby empowered and directed to re-rate the members transferred from the first, second and third classes under resolutions passed by the Supreme Lodge at the session of 1884 permitting such members to enter the fourth class at the age they were when becoming members of the first, second and third classes. The board is instructed to re-rate this class of membership so as to require them to hereafter pay as of their age when becoming members of the fourth class, said re-rating to take effect at such date as the board shall prescribe, on and after the 1st day of August, 1888; *and the board is further empowered to re-rate the present tables of the fourth class, applying it to all members, should such action become necessary for the proper protection and perpetuity of the Rank.*"

Article 10 of the alleged new general law, rules, and regulations reads:

"Amendments. The provisions of these general laws may be altered or amended at any regular session of the Supreme Lodge of the Endowment Rank, Knights of Pythias of the World."

It is evident that the witness Walter O. Powers, who was only 12 or 13 years of age in 1888, has no personal knowledge of what transpired in the Supreme Lodge in 1888, when it is claimed the new constitution and laws were enacted and promulgated. His statement cannot be accepted as evidence that they were either enacted or promulgated. But he says he has control and possession of the records. If so, why were the records not offered in evidence and read in evidence? Those records have not been proved or produced before the court, or even offered or read in evidence. Powers does not even say that Exhibit A (the alleged new constitution) is a copy of anything found in the records.

When the complainant, Arthur V. H. Smythe, took out his certificate, he was furnished a copy of the constitution and general laws and a table of assessments on which he relied, and on which he had the right to rely in paying his money, his regular assessments, thereafter, and also a pamphlet, the authenticity of which has not been denied, stating that his assessments would always remain the same, and would not be increased with added years. His contract was that he should and would pay regular assessments as per the table found in the constitution given him, viz., $3 per month. He was also to pay extra assessments for special purposes.

This corporation is organized under a law of Congress, and the corporation assumed to do business, and did do business, in the state of New York, where the subordinate lodge or section was located, the membership and certificate applied for and executed by the complainant. It is contended by the defendant that, under these circumstances, the decisions of the Court of Appeals in the

state of New York are not controlling, but that those of the Supreme Court of the United States and of the federal courts are, and that under them the complainant has no cause of action; that the Supreme Lodge had the right to amend its constitution and general laws at any time in the manner provided in the old constitution and increase assessments of the old members, re-rate them, as was done in 1910, and that all the members who had taken certificates prior to that date and paid at the old rates in force at the date of their applications and certificates are bound by such actions of the Supreme Lodge. The contention, on the other hand, is that this is a New York contract and governed by the decisions of the highest court of the state.

In Wright v. Knights of Maccabees of the World, 196 N. Y. 391, 89 N. E. 1078, 31 L. R. A. (N. S.) 423, 134 Am. St. Rep. 838, the application for the certificate or policy and such certificate provided that on the death of the holder an assessment on the membership should be paid to the beneficiary named on condition that the holder should have in every particular complied with the laws of the order in force, or that may hereafter be adopted, and the application provided that the laws of the order "now in force or that may hereafter be adopted shall form the basis of this contract." Seven years later the by-laws were so changed without the consent of the certificate holder as to increase the assessment which such holder refused to pay. It was held that such amendment did not affect or bind the member, and that he was not obligated to pay the increased assessment. Vann, J., all concurring, in giving the opinion of the court, said:

"The question presented for decision is whether the reservation by the defendant of a general power to amend its by-laws, without specifying in what respects, authorized it to amend them in all the particulars above mentioned. In other words, can such an association amend a specified clause under a general power?"

The learned judge then proceeds:

"The amendments involve, not only a substantial increase in the rate of assessment, but also a substantial decrease in the amount of benefits. While the member is now required to pay more than twice as much as before, he is to receive, in return, materially less than before. He is deprived altogether of the benefit to which he was entitled upon reaching the age of 70, and is deprived of a material part of the benefit to which he was entitled in case of disability. While it was specifically provided that he should 'pay at the same rate of assessment thereafter,' the rate of assessment is now more than doubled. The benefits were specified, and the rate was specified, and can such a contract of insurance be so amended by the insurer, under a general power, as to take away from the insured without his consent an essential part of what he specifically contracted for? If the defendant had stated in the body of the certificate that it reserved the right to amend by increasing assessments and reducing benefits, the plaintiff would have had notice of what he might expect, but, in that event, it is doubtful whether he would have taken out the insurance, yet the defendant is forced to claim that the contract now has precisely the same meaning and effect as if it had been drawn in that form. The general reservation doubtless authorized the defendant to amend its by-laws so as to cover subjects not therein specifically provided for and even in other respects, which would not essentially impair the contract as made. But the subjects of assessments and benefits were specifically

provided for, each being defined in express terms, so that the member knew what he was bound to pay and what he was entitled to receive. After he had acted upon those specifications in the contract by paying at the rate provided thereby for seven years, the plan of insurance was changed from term to life, while the assessments were so advanced and the benefits so reduced as to make a new contract of much less value to him than the old. * * * 'While the defendant may doubtless so amend its by-laws, for instance, as to make reasonable changes in the methods of administration, the manner of conducting its business and the like, no change can be made which will deprive a member of a substantial right conferred expressly or impliedly by the contract itself. That is beyond the power of the Legislature as well as the association, for the obligation of every contract is protected from state interference by the federal Constitution.' See, also, Parish v. New York Produce Exchange, 169 N. Y. 34 [61 N. E. 977, 56 L. R. A. 149]; Langan v. Supreme Council American Legion of Honor, 174 N. Y. 266 [66 N. E. 932]; Simons v. American Legion of Honor, 178 N. Y. 263 [70 N. E. 776]; Dowdall v. Catholic Mutual Benefit Ass'n, 196 N. Y. 405 [89 N. E. 1075, 31 L. R. A. (N. S.) 417]. * * *

"I am personally of the opinion that the amendment increasing the rate of assessment is also void, for I can see no difference in principle between reducing benefits and increasing the amount to be paid for benefits. The plaintiff entered into the contract on the faith of the promise by the association that he should 'pay at the same rate thereafter so long as he remains continually in good standing in the order,' which he had the right to assume and the defendant knew that he would assume, was a covenant not to increase the rate. . The certificate states that 'he is entitled to all the rights, benefits and privileges' provided by the laws of the order, which are thus made a part of the certificate. Hence the right to pay at the old rate was one of the rights provided for and that he contracted for. It was a vested right, immune from change by amendment, in the absence of a specific reservation of power to amend in that particular. On the average, such contracts would be impaired by doubling assessments, to the same extent as by cutting off one-half of the benefit. The price to be paid by the plaintiff for insurance is as essential a part of his contract as the amount of insurance to be paid to him by the defendant on the maturity of the policy. Whether the one is increased or the other proportionately decreased makes no difference in principle, or in the final result. By either method the pecuniary value of the contract, which is property, would be reduced one-half. * * * I think that an increase in the rate of assessment falls under the same condemnation of the law as a reduction in the amount of benefits. A judgment requiring the defendant to perform according to the contract as made, and not as amended, yet requiring the plaintiff to pay according to the contract as amended and not as made, would contain inconsistent provisions, one of which would necessarily violate the principle upon which the other was founded."

In Dowdall v. Supreme Council of the Catholic Mutual Benefit Association, 196 N. Y. 405, 89 N. E. 1075, 31 L. R. A. (N. S.) 417, the syllabus is:

"The defendant, a mutual benefit life insurance association, issued to plaintiff a certificate of membership therein, upon the condition that he should 'in every particular while a member of said association comply with all the laws, rules, and requirements thereof.' Plaintiff also received a printed book containing the constitution and by-laws of defendant. One of the articles of the constitution provided, in substance, that all members should be assessed according to their age when admitted. The question presented is whether, by subsequent amendment of the constitution or any of the rules or regulations made after the issue of the certificate, defendant may increase the rate of a single assessment against plaintiff. Held, that the covenant on the part of plaintiff that he would comply with all the laws, rules, and requirements of the association refers only to such as existed at the time he entered into his contract, and that any changes or

alterations thereafter made therein, or additions thereto, seeking to modify or alter said contract do not bind him."

In Rockwell v. Knights Templars & Masonic Mutual Aid Association, 134 App. Div. 736, 119 N. Y. Supp. 515, the court held:

"While every corporation has a right to make and change its by-laws in a manner not inconsistent with law, it cannot impair the obligation of outstanding contracts, or impose upon a party contracting with it obligations which he never assumed. The fact that a party contracting with a corporation is a member thereof does not entitle the corporation to impair the obligations of the contract by a change in its by-laws. The courts will not permit a party to change the terms of his contract because it proves unwise or unprofitable."

Kellogg, J., in giving the opinion of the court and citing Ayers v. Order of United Workmen, 188 N. Y. 280, 80 N. E. 1020, said:

"It is repugnant to the idea of a contract that one of the parties may, at his election, from time to time change the amounts which he is to receive from the other party under the contract and the consideration which he is to render to the other contracting party, and, if it is possible to make such contract, the language used must permit of no other construction. Ayers v. Order of United Workmen, 188 N. Y. 280 [80 N. E. 1020]. The period and rate table indorsed upon the plaintiff's policy became a part of it, and there is no suggestion in it, or in the policy itself, that that table may be changed. The by-laws deemed material by the defendant were made a part of the policy by indorsing them on the back thereof, and there is no suggestion therein that the defendant had the right to change its by-laws, and, in fact, it had no by-law permitting such change. Every corporation has the right to make and change its by-laws in a manner not inconsistent with law, but such right does not give it the power to change its written contract, or impose upon a party contracting with it obligations which he never assumed. It is said that the defendant is a member of the corporation, and is · therefore an insured and an insurer at the same time. But every contract has at least two parties who stand as separate entities; each dealing with the other at arm's length. The fact that one of the contracting parties is a stockholder or member of a corporation does not permit the corporation by an alleged change of its by-laws to alter the terms or effect of contracts which it has already made. The fact that a contract proves unprofitable, or will bring ruin upon one of the contracting parties, is no reason why the courts can permit the party who has made such an unwise contract to change its terms at will, and make for itself a more profitable contract. A member of a copartnership who purchases property of the firm in good faith cannot be required to pay a greater consideration than that agreed upon for the reason that the contract is unprofitable to the firm, and that he is a member of the firm and is interested in its welfare."

In that case, as here, it was said that as the defendant was a foreign corporation, the decree of the court, if pronounced, could not be enforced, and of that contention the court said:

"It is argued, however, that the court is powerless to compel the nonresident officers of the defendant to perform the contract and to treat the plaintiff as a policy holder. That objection refers only to the manner of enforcing the judgment after it is rendered. The court may be powerless to punish the nonresident officers for contempt if they do not observe its judgment, but while the defendant continues to do business in this state there will be little difficulty in the enforcement of a proper judgment against it."

[2] I find it difficult to understand how it can be held that a person who takes out a certificate or so-called policy of insurance in a

fraternal benefit association or society agreeing thereby to pay a certain specified sum monthly, specified therein or thereon (and also certain special assessments for specific purposes if necessary), his application and certificate referring to the constitution and laws of the order which are presented to and accepted by him with his certificate and accompanied by a written statement or representation that his assessment will always remain the same, has assented to an increase of such monthly assessment, an increase of his burden under the contract, or a change in the terms of his contract, by agreeing that he "will punctually pay all dues and assessments for which he may become liable and that he will be governed and that the contract shall be controlled by all the laws, rules and regulations of the order, governing the members of that rank, now in force or that may hereafter be enacted." It cannot well be questioned that such a corporation as this defendant may expressly reserve the right and power to increase the monthly assessments, but this must be so explicitly and clearly stated in some part of the contract or in some paper forming a part of the contract that the member insured is fully informed or advised that the terms of the contract he is entering into may be changed by the insurer in that respect. Beach v. Supreme Tent K. of M., 177 N. Y. 100, 105, 69 N. E. 281, 283. In that case Judge Cullen, one of the ablest judges ever on the bench of this or any government, said:

"It is quite easy for fraternal organizations, such as the defendant, if they deem the provisions for benefits to their members tentative only and desire to have them subject to such modification as the business of the orders may require, to express that in the certificate. So, in the present case, if the certificate had provided that the payments therein specified should be subject to such modification as to amount, terms, and conditions of payment and contingencies in which the same were payable as the endowment laws of the order from time to time might provide, the amendments would be applicable to existing members. But I think that nothing less explicit than this appearing in the certificate itself should be effectual for such a purpose. Fairness to persons joining the order required such plain dealing."

See, also Langan v. Supreme Council Am. L. of H., 174 N. Y. 266, 66 N. E. 932. In Ayers v. Grand Lodge of Ancient Order of United Workmen of State of New York, 188 N. Y. 280, 285, 286, 80 N. E. 1020, 1021, the court held:

"While a 'mutual benefit fraternity,' or fraternal insurance society, may so amend its by-laws as to make reasonable changes in the methods of administration, the manner of conducting its business and the like, no change can be made which will deprive a member of a substantial right conferred expressly or impliedly by the contract itself. That is beyond the power of the Legislature as well as the association, for the obligation of every contract is protected from state interference by the federal Constitution."

In the opinion it is said:

"It is well established by these authorities 'that a general power reserved either by statute or by the constitution of a society to amend its by-laws does not authorize an amendment impairing the vested rights of members.' An amendment of by-laws which form part of a contract is an amendment of the contract itself, and, when such a power is reserved in general terms, the parties do not mean, as the courts hold, that the contract is subject to change in any essential particular at the election of the

one in whose favor the reservation is made. It would be not reasonable, and hence not within their contemplation, at least in the absence of stipulations clearly specifying the subjects to be affected, that one party should have the right to make a radical change in the contract, or one that would reduce its pecuniary value to the other. A contract which authorizes one party to change it in any respect that he chooses would in effect be binding upon the other party only and would leave him at the mercy of the former, and we have said that human language is not strong enough to place a person in that situation. Industrial & General Trust, Limited, v. Tod, 180 N. Y. 215, 225 [73 N. E. 7]. While the defendant may doubtless so amend its by-laws, for instance, as to make reasonable changes in the methods of administration, the manner of conducting its business and the like, no change can be made which will deprive a member of a substantial right conferred expressly or impliedly by the contract itself. That is beyond the power of the Legislature as well as the association, for the obligation of every contract is protected from state interference by the federal Constitution. Article 1, § 10."

Fredendall, the secretary of section No. 279 E. R., at Amsterdam, who attested and delivered the certificate or so-called policy, was the agent of this defendant. Supreme Lodge, Knights of Pythias, v. Withers, 177 U. S. 260, 20 Sup. Ct. 611, 44 L. Ed. 762; Whiteside v. Supreme Conclave (C. C.) 82 Fed. 275; Knights of Pythias v. Bridges, 15 Tex. Civ. App. 196, 39 S. W. 333. The last two cases cited and approved in 177 U. S. at page 274, 20 Sup. Ct. 611, 44 L. Ed. 762, and Campbell v. Knights of Pythias, 168 Mass. 397, 47 N. E. 109, disapproved in the same case, 177 U. S. at pages 275, 276, 20 Sup. Ct. 611, 44 L. Ed. 762. In Indiana the same general doctrines as stated in the New York cases are held. Court of Honor v. Rausch (Ind.) 95 N. E. 1018. It is there said:

"The certificate under consideration was issued to the insured more than five years before his death. It has long been settled not only by the courts of this state and others that amendments to by-laws, which may be adopted by societies such as appellant, cannot in any way change the terms of contracts previously made, so as to impair or modify the obligations created in contracts of insurance. Compliance with future by-laws has reference to such by-laws as may be adopted at some future time pertaining to the duties of the members, but cannot affect the rights granted such members by virtue of the contract of insurance."

There is a long line of cases in the Court of Appeals of the state of New York all to the effect above stated on all the material propositions involved in this case. We turn now to the decisions of the federal courts.

Defendant's counsel cites Supreme Lodge of Fraternal Union of America v. Light (C. C. A., 8th circuit), 195 Fed. 903, as the last word on this subject, and as an authority that ought to be followed by this court. In that case the constitution of the order prohibited its members from engaging in the occupation of saloon keepers, bartenders, or manufacturers of intoxicating liquors. By a subsequent amendment it was provided that any member who should "enter upon the manufacture or sale of malt, spirituous or vinous liquors to be used as a beverage, in the capacity of proprietor, stockholder, agent or employé should forfeit all rights as a member either social or beneficial." The court held that this amendment was germane and reasonable and binding on an existing member

whose contract was expressly subject to such by-laws or rules as might thereafter be adopted by the Supreme Lodge. The amendment prohibited a member from becoming the agent of a manufacturer of intoxicating liquors in that business and also prohibited a member of the order from becoming a stockholder in a corporation or company engaged in such business. In short, if a member of the order who had paid money and had vested rights in benefits should become the agent to purchase grain or machinery for a manufacturer of intoxicants or should voluntarily or by operation of law become the owner of stock in a company or a corporation engaged in manufacturing intoxicants, he was to forfeit all his rights, both social and beneficial. Conceding that a manufacturer of intoxicating liquors is exposed to perils and risks, or to temptation and danger prejudicial to health and longevity which the lodge would not insure against, I am so blind that I cannot see how holding stock in a company or a corporation engaged in manufacturing intoxicating liquors exposes the holder of such stock to any "temptation and danger prejudicial to health and longevity." I cannot agree with the Circuit Court of Appeals, Eighth Circuit, that "there was nothing radically new in the amendment of 1902" (the one referred to), nor can I concur in its statement that "it was not inconsistent with existing provisions of the members' contracts, but in substantial accord with them," when such amendment went to the extent of divesting the vested beneficial rights of an old member if he became the agent of a manufacturer of intoxicating liquors or purchased or became the owner of stock in a company or corporation engaged in that business. The court in the case cited holds the true rule to be:

"That a member of a fraternal beneficial organization who accepts membership subject to such by-laws and rules as the Supreme Lodge may thereafter adopt is bound by any reasonable legislation thereafter adopted."

It then proceeded to hold that it is reasonable legislation to amend a constitution and by-laws prohibiting its members from "engaging in the occupation of saloon keepers, bartenders, or manufacturers of intoxicating liquors" so as to prohibit its members— members prior to such amendment—from becoming the agents of such manufacturer or stockholders in a company or corporation engaged in such manufacture and destroy their vested pecuniary and beneficial interests if they did. However much the courts and judges may differ as to the reasonableness of such legislation, if we accept the rule stated as the true one, we must inquire whether it was reasonable legislation for the defendant here to increase the monthly assessment of this complainant and all similarly situated, and who had paid in his money for some 22 years on the representation that such assessment would not be increased and in accordance with the provisions of the only constitution and laws of which he had any knowledge or information, from $3 per month or $4.80 per month to $14.70 per month, or, at his option, reduce the value of his policy or certificate at maturity from $3,000 to $978. The complainant has now paid in about $900, and, if (under this

alleged new or amended set of constitution and laws) he should accept the option offered and continue to pay at the old rate, he would pay in (assuming he lives a few years only) considerable more than his children would get under the certificate. It would amount to putting his money for 20 or more years in monthly installments into the hands of this corporation for its own uses on its promise to refund to his children a part of the principal at his death. Such a proposition, if made or suggested to those who became members in 1888, or at a later date, would not have been accepted or even considered. The old members in good health and with a fair prospect of life will not consider the propositions offered or accept same except on compulsion, and then only with the hope of eventually saving a part of the money heretofore paid in without interest. It will effect a freeze-out of the old members, who for years have paid in their money for the benefit of new members, and, of course, operate to prolong the life of the corporation, if effective. I regard the increased assessment unnecessary and unreasonable.

In Fullenwider v. Supreme Council of Royal League et al., 180 Ill. 621, 54 N. E. 485, 72 Am. St. Rep. 239, it is held, three of the seven judges dissenting, that a certificate of membership which provides that the members shall be bound by the laws, rules, and regulations then in force or which may thereafter be enacted by the society, sufficiently reserves the right in the society to subsequently amend then existing by-laws and increase the rates then fixed by such by-laws; the certificate itself not mentioning any rate of assessment. In that case the by-laws fixed the rates to be paid which constantly increased with the age of the holder and ranged from $1.34 at 21 years of age to $3.44 at 45 years of age. The amended by-law increased the rate to be paid by the complainant at his then age from $2.62 to $4.52, and the court held that this was a reasonable amendment or change of assessment. The court said:

"It is apparent that the new by-law was adopted in the manner provided for in the laws of the society, and was not an unreasonable enactment. It was enacted under a right to amend the by-laws reserved expressly in the contract, and hence it cannot be claimed it in any manner impaired any vested right."

Caldwell v. Grand Lodge, etc., of California, 148 Cal. 195, 82 Pac. 781, 2 L. R. A. (N. S.) 653, 113 Am. St. Rep. 219, 17 Ann. Cas. 356, cited by the defendant here, in no way sustains its contention. In that case Baker took a beneficiary certificate in the order payable to the Humboldt Savings & Loan Association as trustee of his estate. As a condition he agreed that compliance on his part with all laws, regulations, and requirements which are or may be enacted by said order "is the express condition upon which I am to be entitled to participate in the beneficiary fund," etc. While this certificate was outstanding the laws were so amended as to require that one designated as beneficiary should be a member of the family, or related by blood, or "who shall be dependent upon

him." After this amendment went into effect and became operative, Baker revoked his beneficiary, said Humboldt Savings & Loan Society, and named Mrs. Caldwell. Mrs. Caldwell was in no way related to Baker, was not a member of his family, and was not dependent upon him. There was nothing in the original contract that gave Baker the right to change the beneficiary at any time without the consent of the Grand Lodge. Mrs. Caldwell after the death of Baker demanded payment of this certificate, which was refused. The court held:

"Where the original by-laws allowed any person to be named by the member as a beneficiary, a change in the by-laws of the order requiring one to be designated as a member of the family, or related, by blood, or 'who shall be dependent upon him,' is reasonable; and after it went into effect the member had no right to name a beneficiary any other than one of the classes therein designated. * * * Where the member subsequent to the change in the by-laws surrendered his former certificate, the beneficiary in which might have been protected as against such change, and took a new certificate, designating such married woman as 'dependent upon him,' by force of the amendment such designation justified the order in issuing the certificate, and was a representation upon the truth of which the validity of the contract depended, and amounted to a warranty."

The court in its opinion said:

"It is, however, contended that as Baker became a member of the order at a time when its by-laws permitted him to have the certificate issued in favor of any person a subsequent change in the by-laws limiting the classes of persons to whom such certificate could be issued was an impairment of his contract, and thereby void as to him, and as to the certificate actually issued in favor of this plaintiff. It is unquestionably true, that in a policy of life insurance a designation of a beneficiary valid in its inception remains so, although the insurable interest or relationship of the beneficiary has ceased, unless otherwise stipulated, in the contract. Courtois v. Grand Lodge, 135 Cal. 557, 67 Pac. 970, 87 Am. St. Rep. 137; Wist v. Grand Lodge, 22 Or. 271, 29 Pac. 610, 29 Am. St. Rep. 603. But such is not the proposition here presented. This principle would have been applicable if refusal had been made by the order after the passage of its amended by-law to pay the certificate in favor of the Humboldt Savings & Loan Society, which was a valid certificate in favor of that institution at the time of its issuance. In this case Baker surrendered that certificate, and, while the amended by-law was in force, caused a new certificate to be issued to a person who under the by-law was not entitled to it. Baker had not been compelled to designate a new beneficiary; but, having voluntarily undertaken so to do, could he or could he not designate a beneficiary not contemplated by the by-law then in force? We entertain no doubt that this he could not do."

The new by-laws did not purport to change the contract as it then existed. That contract was voluntarily surrendered and a new one taken in its place after the new laws went into effect, and it was, of course, subject to the by-laws in force at the time it was taken.

Messer v. Grand Lodge United Workmen, 180 Mass. 321, 62 N. E. 252, does not support the defendant's contentions here, as there the certificates were silent as to the rates to be paid. The contract was that the members should have all the rights and privileges of membership with a right to participate in the beneficiary fund to the amount of $2,000 to be paid at death on condition that

the member complies with all the laws, rules, and requirements of the order. The defendant was organized and existed under a statute of the state of Massachusetts. The statute was amended to expressly authorize the corporation to collect assessments from the members at different rates according to the age of the members. The contention was that the corporation could not do this and could only collect assessments at a fixed rate, the same for all members of the order without reference to their age. No question of interfering with vested contract rights was involved. The case of Reynolds v. Royal Arcanum, 192 Mass. 150, 78 N. E. 129, 7 L. R. A. (N. S.) 1154, 7 Ann. Cas. 776, is a case quite in point, and at variance with the New York cases. If good law it sustains the contentions of the defendant here. As the case was determined largely on the force of the statutes of the state of Massachusetts, it is not decisive except in so far as it interprets those laws and determines the rights of the parties under them. Gaines v. Supreme Council of Royal Arcanum (C. C.) 140 Fed. 978, is not an authority either way. Judge Clark denied an injunction on the ground it was a question of Massachusetts law, and dismissed the bill without prejudice to a new suit in the state of Massachusetts. I am cited to Wright v. Minnesota Mutual Life Insurance Co., 193 U. S. 657, 24 Sup. Ct. 549, 48 L. Ed. 832, as sustaining the defendant's contention here. However, I find nothing in the facts of the case or in the opinion of the court that in any way tends to sustain that position. On the contrary, the facts stated show that every right of all the old members was protected and preserved, and that, in effect, they were allowed to continue to pay in the old way, and that their beneficiaries were to be paid on the basis of the original plan or contract. Wright became a member of the company in 1892. In 1898 amended articles of association and by-laws were adopted. Now, quoting from the case:

"The amended articles declared that the by-laws shall contain provisions which shall operate to preserve, continue, guard. and protect all of the existing rights and privileges of and promises and pledges to persons who were members at the time the amended articles became operative. Under the new articles a form of policy was issued, known as the 'guaranteed option policy.' These policies were issued to new holders, and members under the assessment plan were permitted to transfer their membership so as to receive such policies, which required the payment by the insured of a stipulated annual premium in advance."

In 1901, as authorized by an act of the Legislature, the company accepted the provisions of the act "making the company a regular reserve company with a policy on which a stated premium is paid and a fixed sum is payable at death to the beneficiaries of the assured." The act referred to provided amongst other things:

"That nothing herein contained shall impair or operate to impair the obligation of any contract," etc.

The by-laws of the new company reorganized under the act provided:

"Sec. 1. To the extent necessary to provide and continue the rights and privileges of any member holding a mortuary assessment certificate, and to

preserve and secure the fulfillment of all contract obligations to him, and to continue and perpetuate in the company the power and authority to levy assessments and to do and perform all and everything necessary or expedient to enable it to carry out the mortuary assessment contracts in accordance with the terms thereof and with the law and present by-laws in such case made and provided, the present and existing by-laws shall continue in full force and effect."

In short, all old contracts were to be carried out and performed according to their terms on the old plan if the holder desired, and there is not a line or word in the case that indicates that such a corporation may increase assessments at will, as was done here. Both the Legislature and reorganized company seemed to have assumed that it could not lawfully be done. The court repeatedly states that the existing contracts were not changed, and that contract rights were not interfered with. I am also cited to Polk v. Mutual Reserve Fund Life Association of New York, 207 U. S. 310, 28 Sup. Ct. 65, 52 L. Ed. 222, as authority for the defendant's contention here. But I fail to find in that case anything that supports the contention of the defendant which stated in the language of its counsel is that:

"A fraternal beneficiary society has the right to increase its rates and change its plan of insurance as necessity may require for the purpose of enabling it to meet its obligations to its members."

In the Polk Case, supra, the company was originally incorporated under chapter 267 of the Laws of New York of 1875. There was a reserved power in the Legislature to alter, amend, or repeal charters, etc. Section 52 of the Insurance Law of New York (chapter 38, General Laws of 1892, and amended by chapter 722, Laws of 1901) provided for the "reorganization of existing corporations and amendment of certificates." The court says:

"Following strictly the provisions of this section the association accepted the provisions of the insurance law, amended its charter, and became entitled to all the privileges of the law as if it had been originally incorporated thereunder."

The court then refers to the change made, and says:

"The effect of this was to broaden the business from that of merely cooperative and assessment life insurance to life insurance of every kind. It is conceded that what was done was within the authority conferred by the statute, and the subject for our consideration is whether any of the rights secured to the complainants by the Constitution of the United States has been impaired. * * * We answer this and the other questions upon the assumption, therefore, that the old corporation was still in existence, under a new name and with added powers, but with unchanged membership, and bound to perform all its existing obligations. Upon this view it is impossible to say that any of the contract obligations of the association to the complainants have been impaired by the reorganization. This was the view apparently accepted by the company, who, in its notice to its members, said: 'This reincorporation while insuring the stability of the company makes no change in your policy.'"

Then at page 327 of 207 U. S., at page 71 of 28 Sup. Ct. (52 L. Ed. 222), the court continues:

"The other two questions certified inquire whether the law under which the reincorporation was made, or the reincorporation and changes in power made under its provisions, are in violation of the fourteenth amendment to

the Constitution of the United States. These questions do not require separate or detailed consideration. As applied to the facts of this case, they are practically dealt with in the discussion which has preceded. It is not suggested that any rights secured to the complainants by the fourteenth amendment were violated in any other manner than by the reincorporation of the association without the consent of its members, the change in and addition to its powers, and the consequent effect upon the contract rights of the complainants and upon their relation to the corporation. But it has been shown that the contract rights of the complainant have not been affected by the reincorporation, and the same reasoning that leads to the conclusion that the changes in the charter powers, made under the reserved powers of the state, do not violate the contract clause of the Constitution, are apt to show that they do not violate the fourteenth amendment. In fact, the only suggestion of a violation of the fourteenth amendment made to us is that the reincorporation, under the circumstances of this case, deprived the complainants of their vested rights and privileges and property rights under their contracts, without due process of law. Since the incorporation has deprived the complainants of no vested rights, privileges or property, the contention fails."

I had never supposed that, when the Legislature of a state enacts a law authorizing the incorporation of insurance companies and the right to alter, amend, or repeal is expressly reserved in the act itself or by constitutional provision, it may not do so, and, if the law under which the incorporation took place is amended so as to confer new powers and privileges, I can see no objection to the corporation availing itself of the amendment. So long as fixed and vested rights are not interfered with, no member can complain of such action, and these cases in the Supreme Court of the United States not only recognize this principle, but are careful to point out that all contract rights were protected and preserved, and that no existing contract was impaired. There is no suggestion in either case that such a corporation, even to preserve its existence, may increase the amount of the assessments to be paid by the assured and definitely fixed by the contract of insurance without his consent and exact same on the penalty of forfeiting his contract and all benefits earned and paid for. Order of United Commercial Travelers of America v. Smith, 192 Fed. 102, 112 C. C. A. 442, is not in point, as it relates to an amendment to the constitution merely defining "injuries through external, violent or accidental means" to exclude any death, disability, or loss resulting from infection except when the same resulted from an open wound, and any death, disability, or loss of which there was no external and visible mark on the body, the dead body not being such a mark, except in case of drowning or asphyxiation. The former constitution provided that injuries through external, violent, or accidental means should not extend to any bodily injury of which there should be no external or visible signs. In Green v. Supreme Council of Royal Arcanum et al., 144 App. Div. 761, 129 N. Y. Supp. 791, the court held:

"Where a contract between a member and a fraternal benefit insurance association provides for the payment of a fixed sum upon the death of the member, and that assessments shall be at a specified rate, neither the conditions upon which the same shall become payable can be altered, nor can the sum to be paid be reduced, nor the amount of the specified assessment increased without the consent of the member, which rule is not altered by the fact that the contract may reserve a power to amend the

by-laws in purely general terms. But if there be reserved in such contract a power to amend the laws governing the association reasonably designating the subjects thereof, so that a person when applying for membership is fairly advised that the terms of the contract he is about to make may be altered in the respects referred to, subsequent changes in the by-laws may be made, if reasonable, and the change must be deemed to have been assented to by the member."

[3] In the case at bar we fail to find any reservation of power to amend in the contract of insurance which in any way designates the subjects to which amendments shall relate. The language is, "these laws may be altered or amended" and "the provisions of these general laws may be altered or amended," etc. Under this language, giving it full effect, if one line or word could be amended, all could be, and the contract changed in its entirety. In the case last cited the benefit certificate expressly stated that the member should comply with the laws that "might thereafter be enacted to govern the relief fund." This the court construed as sufficiently explicit in providing for an amendment which increased the assessments to make the relief fund.

It is not questioned in the New York cases to which attention has been called at some length that under such general language the by-laws of a corporation or of an association may be amended in those respects which go to the general management and control of the company and the government of its internal affairs. When it comes to so amending by-laws, which are a part of the contract of insurance, as to materially affect and change the obligations of such contract and destroy rights or seriously impair rights vested, we have a different question. This subject of amending by-laws, and what may and may not be done under a general power, was ably, learnedly, and, I think, wisely and reasonably, discussed by Parker, Ch. J., in Parish v. New York Produce Exchange, 169 N. Y. 34, 45, 61 N. E. 977, 56 L. R. A. 149, where many cases are cited and in part quoted. In Railway Co. v. Allerton, 18 Wall. 233, 21 L. Ed. 902, the charter of the corporation fixed the capital stock, and then expressly stated that such capital stock "may be increased from time to time at the pleasure of the said corporation," and also expressly stated that:

"All the corporate powers of the said corporation shall be vested in and exercised by a board of directors and such officers and agents as such board shall appoint."

The court held that the powers thus granted to the board of directors referred to the ordinary business transactions of the corporation only, and did not authorize such board to increase the capital stock. I think courts should and will hold that by-laws are made primarily for governmental purposes and the proper regulation and conduct and management of the affairs of the corporation or association, and not for the purpose of either making contracts or unmaking or changing or impairing the obligation of contracts already existing. By what percentage of the membership of these fraternal associations would it be understood that a consent to change or amend the by-laws of the company would carry a consent to change his pecuniary obligation to the association or corporation under a written contract with

it? It is said in some of the cases as a reason for holding that a general power to amend the by-laws carries the power to increase the fixed assessments of the member that to hold otherwise would work a hardship on the new members as they would be carrying the burden of low rates of assessment paid by old members. But is it not true that the new members come in voluntarily and assume the burdens, if any, of carrying out old contracts according to their terms? There are other decisions on this question, many of them in conflict, which will be found cited in the cases to which attention has been called. I have respect for all and for the courts pronouncing them, but cannot follow them all. This court is bound by the decisions of the Supreme Court of the United States and those of the Circuit Court of Appeals in the Second Circuit. I find no controlling case in either of these courts. I think the cases in the Supreme Court of the United States to which attention has been called, fairly construed, are in perfect harmony with the cases in the Court of Appeals of the state of New York which accord with my own views of the law, or what the law ought to be. I cannot assent to the proposition that for the reason an insured member of one of these fraternal beneficial associations occupies the dual position of insurer and insured, it is said, but incorrectly, he is therefore under an obligation and impliedly promises to provide means for making all contracts good. If we adopt this contention and carry it to its legitimate conclusion, the government of a state, or of the United States, may for the general good of all its people, when in its judgment necessary, change its contract with the citizen so as to impose on him onerous pecuniary obligations he never undertook to perform. He is bound to do what he promised to do in his contract with the government, but no more, and the government has no right to claim more or prescribe changes in his contract through its Legislature or judicial departments. Should a clause be inserted in the contract whereby the citizen, a party to such a contract with the government, should in general terms agree to be bound by all laws of the United States then in force or that might thereafter be enacted, would he be held to consent thereby to a change in the terms of his contract with the government made by some special act of Congress? I think such a construction would be unreasonable, oppressive, and unconstitutional. True he would be represented in Congress, true he would be interested in having all contracts of his government performed and the life and existence of his government prolonged and its credit preserved, but I am of opinion that this or these considerations would not authorize Congress to provide by law that every citizen of the United States holding a government bond for $100 or more should accept 10 per cent. thereof in full payment, or pay into the treasury of the United States 90 per cent. of his holdings in order that all bonds outstanding of the same issue and of all subsequent issues should be fully paid. In New York towns and counties are declared to be corporations and their citizens may contract with them. They, if taxable, pay their proportion of all taxation, but their contracts are as sacred from attack by a vote of the people of the town, unless a special provision is contained therein as

are those made with a citizen of some other town or county. I dissent entirely from all the cases holding that the terms and obligations of a contract of insurance between one of these fraternal corporations and one of its members may be in any manner changed by an amendment to its constitution or by-laws, unless the power is specified in and granted by the law creating the corporation, under a general consent in the contract to be bound by all by-laws then in existence or that may thereafter be adopted.

[4] If defendant had proved by competent evidence that the alleged constitution and by-laws of 1888 had been duly adopted and put in force and were in force when the complainant made his application and received his certificate, the question would be in the case whether or not special power to increase assessments was sufficiently reserved thereby. The fact that the defendant offered in evidence no records of the Supreme Lodge, or excerpts therefrom, and failed to prove or offer evidence that the alleged new constitution and laws of 1888 were ever in the hands of its officers or members, or any of them, with the certain proof by complainant and the agent of defendant, Fredendall, that the constitution and laws of 1886 are the only ones they ever saw, and are the ones given to complainant and sent the agent by the corporation for distribution to members and distributed by him, satisfies me that such alleged new constitution and laws never became operative, at least so far as complainant is concerned. It is true that a member of one of these societies is presumed to know and be bound by the constitution and by-laws in existence, but the presumption may be rebutted by showing that the corporation itself gave to the member other constitution and by-laws on which he acted. To hold that a corporation may distribute to its members one set of constitution and by-laws for their information and guidance on which such members act, and then hold them to the provisions of another set, would violate every principle of justice.

Complainant's Exhibit D is the statement sent out and received by complainant headed: "Important. The Only Pythias Insurance." It contains the table referred to headed: "The following table of monthly payments shows the cost under each age and amount of endowment applied for." This table under the age 37 and amount applied for $3,000 shows monthly payment to be $3. This Exhibit D also contains the statement: "These payments do not increase [the words 'do not increase' italicised] with increasing age but always remain the same during good standing of the member." Mr. Powers, defendant's witness, was asked:

"When, if you know, was plaintiff's Exhibit D published and sent out, if it ever was published and sent out by the Supreme Lodge, Knights of Pythias, or by the board of control? Ans. In the year 1894."

This to me is entirely inconsistent with the claim that in 1888 an amendment to the constitution and by-laws had been adopted, and was then in force, permitting and authorizing an increase of the monthly assessments. I conclude that the complainant is entitled to a decree substantially as prayed for in his bill of complaint. The form may be settled at Auburn during the week of October 1, 1912.